# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael Anthony Prozer, III, | ) | Civil Action No.  9:14-1249-TMC-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, et seq.  Plaintiff, a federal prisoner incarcerated at the Federal Correctional Institution in Estill, South Carolina, asserts various tort claims against the Defendant arising out of an alleged assault on him by another inmate, allegedly improper medical care, and invasion of privacy/defamation.

The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on July 21, 2014. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on July 30, 2014, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response.  Plaintiff was specifically advised that if he failed to adequately respond, the Defendant's motion may be granted, thereby ending his case.  Plaintiff thereafter filed a response in opposition to the Defendant's motion on August 22, 2014, following which the Defendant filed a reply memorandum on August 28, 2014.  Plaintiff then filed two

1



additional documents, a "Request to Admit Additional Evidence" and an "Answer to Defendant's Reply", both on September 10, 2014. Plaintiff had also previously filed an affidavit with the Court on July 10, 2014.

The Defendant's motion is now before the Court for disposition.[1]

### Background and Evidence

Plaintiff alleges in his Complaint that he is an inmate at FCI Estill, and that on July 31, 2013, he was attacked by fellow inmate Bryan Best, who was "known to be violent with a history of drugs and weapons". Plaintiff alleges that on that date the corrections officer working the p.m. shift was handing out mail at approximately 6 p.m. Plaintiff alleges that it is "standard practice" amongst the correctional officers, when they are passing out mail, to give mail intended for an inmate to other inmates in what is known as a "send by", for the inmate to deliver the other inmate's mail for them. Plaintiff alleges that this practice, which he describes as a "breach of duty", makes the correctional officer's job easier. Plaintiff alleges that on that date, inmate Bryan Best's mail was given to another unknown inmate to deliver to Best, but that somehow Best's mail (consisting of some magazines) was mistakenly placed on Plaintiff's bed. Plaintiff alleges that when he returned to his room, he saw the magazines and started to glance through them thinking they were his since they had been placed on his bed. Plaintiff admits that he did not look at the address label on the magazines. Plaintiff alleges that Best came to Plaintiff's room to ask if his magazines had been delivered to the Plaintiff by mistake, and that upon looking at the label Plaintiff said yes and he was

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendant has filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.



sorry and gave them to Best.  Plaintiff alleges that Best "was fine and said no problem and it was obviously an accident".

Plaintiff alleges that sometime later he was outside talking to another inmate and then headed back to the Unit F building to get some things from his room.  Plaintiff alleges that upon arriving at some double doors, Best was walking towards him behind two other inmates, and that just as Plaintiff entered the double doors, Best "came out from behind the two inmates with a violent and vicious right hand full weighted swing striking Plaintiff violently in the left side of his head and eye".  Plaintiff alleges that Best followed that punch with "another violent and vicious left punch to the left side eye".  Plaintiff alleges that he raised his arms to cover his head and dropped down into a squatted position to cover himself and his head, at which time Best again punched Plaintiff on the back of the head with his left hand "causing severe injury and permanent scarring", which was followed by another punch to Plaintiff's nose "which resulted in a great deal of blood loss".  Plaintiff alleges that during this attack Best repeatedly said that Plaintiff had lied to him about his mail, and that Plaintiff had stolen his mail.  Plaintiff alleges that he suffered severe and extensive injury to both his left and right eye, his nose, face and back of his head.  Plaintiff alleges that this assault was the fault of the Defendant "by and through the egregious actions of its staff and its designation officers who have, for reasons of prison overcrowding . . . been allowing violent offenders [to] enter camp facilities to the detriment of non-violent inmates".

Plaintiff alleges that he and Best were both called to the Administration Building the following morning at 7:45 a.m. by Camp Administrator E. K. Carlton.  Plaintiff alleges that when he arrived Best was either in another room or being taken to the Special Housing Unit (SHU).  Plaintiff alleges he told Carlton what had happened, following which Plaintiff was driven to the FCI



building where he was also placed in the SHU. Plaintiff alleges that he was interviewed by Lt. Solvik, and photos of his injuries were taken by SIS Officer Wallace. Plaintiff alleges that he was then escorted in handcuffs by Wallace to the SHU, where he was seen by medical staff. Plaintiff alleges he was asked if he had seen stars or blacked out, and the medical staff took his weight, temperature and blood pressure, but that he was otherwise provided no medical care for his injuries. Plaintiff alleges that thereafter his "urgent requests for medical attention were constantly and continue[d] to be ignored", even while he was suffering from headaches, dizziness, pain and severe swelling.[2]

Plaintiff alleges that he continued to receive "absolutely no medical attention . . . whatsoever" despite having filed numerous requests to be seen by medical, which continued after he was returned to "the camp" twenty-one days later. Plaintiff alleges that if not for the breach of duty and negligent instruction and supervision of the correctional officer who was giving out mail to inmates intended for other recipients, there would have been no attack or irreparable injury or resulting "false imprisonment" for twenty-one days in the special housing unit or invasion of his privacy.

With respect to his privacy claim, Plaintiff alleges that upon being placed in the SHU, an inmate who works with staff gathered all of Plaintiff belongings, including his legal and personal mail. Plaintiff alleges that this inmate asked the officer working that day to bring up Plaintiff on the

---

[2]Plaintiff further alleges that, while in the Special Housing Unit, he was refused a towel to shower with and so would have to "drip dry". Plaintiff also alleges that he advised prison personnel that he had a very important legal case that required a response from the Plaintiff, and that being placed in the Special Housing Unit was "irreparably harming Plaintiff from filing a response". However, it does not appear that Plaintiff has intended to assert a claim in this lawsuit with respect to these two allegations.

4



computer, which invaded Plaintiff's privacy as "it is certainly against policy for an officer to allow another inmate to review internet and any articles that contain information regarding other inmates". Plaintiff alleges that the internet contains false articles about him.

Plaintiff alleges that as a direct and proximate result of the breach of duty by the officers who recklessly and without regard improperly handed out mail, he was attacked by inmate Best, and as a result continues to suffer from severe nasal pain, permanent scarring on the back of his head, dizziness, light headedness, and a feeling similar to that of a hangover. Plaintiff alleges that, as proof of his allegation of breach of duty, Camp Administrator Carlton had posted a memorandum on August 5, 2013 stating that all inmates were to get their own mail and not to touch or handle any other person's mail. Plaintiff also alleges that FCI Estill has a history of falsifying medical records and committing medical malpractice, conduct of which the Defendant has known. Plaintiff seeks monetary damages against the Defendant based on these claims. See generally, Complaint.

In his affidavit filed with the Court on July 10, 2014, Plaintiff reiterates the allegations of his Complaint, including that following the attack he was moved to the Special Housing Unit where he was "not given any ice and [ ] was refused ice even though my substantial injuries and head trauma including 2 substantially black and swollen eyes, substantial injuries to my nose and severe swollen trauma to the back of my right side of my head just above my neck". Plaintiff further attests in his affidavit that after several weeks in the SHU he was finally given ice by "Officer Petty" ,who stated that Plaintiff looked like a "raccoon" because his eyes were so black and blue. Plaintiff also "attests" that, upon being placed in the Special Housing Unit, he endured additional emotional and mental pain and anxiety because his cell mate in the SHU was of "the same size, weight and ethnicity (African American) of the inmate who [had] violently attacked me . . . ."



5

Plaintiff further attests in his affidavit that on August 30, 2013, thirty-one days after he was assaulted, he was given an x-ray, following which Dr. Jessica Galandak determined that he had a broken nose. Plaintiff attests, however, that prior to receiving the results from the x-ray, he had been told by Physician's Assistant "Garcia" that "everything was fine and checked out". Plaintiff attests that Garcia looked at the x-ray results and told him that, although his nose was broken, he should let it heal on its own and get it fixed when he left prison. Garcia also advised Plaintiff to get some pain medication from the commissary and use as needed. Plaintiff states that this was a clear "dereliction of duty owed and a negligent act to my medical needs".

Plaintiff attests that he was thereafter seen by "Dr. Reed" on September 19, 2013, who placed him on a vertigo medication (Meclazine). However, Plaintiff attests that at no time was he ever taken to a neurologist or specialist trained and educated to treat and diagnose vertigo. Plaintiff then proceeds in his affidavit to take issue with the administrative response to his tort claim. See generally, Plaintiff's Affidavit (Court Docket No. 18).

In support of summary judgment in this case, the Defendant has submitted an affidavit from Roy Lathrop, Paralegal Specialist with the Federal Bureau of Prisons, who has attached to his affidavit as Exhibit A true and correct copies of Plaintiff's federal tort claim. Lathrop has further attached to this affidavit as Exhibit B a true and correct copy of the Determination Letter on Plaintiff's claim. See generally, Lathrop Affidavit, with attached Exhibits. Defendant does not dispute for purposes of summary judgment that Plaintiff has exhausted the administrative claim requirement of the FTCA. See Defendant's Brief, pp. 2-3.

The Defendant has also submitted an affidavit from Eugene Carlton, who attests that he is the Associate Warden at FCI Miami, but that during the time frame relevant to Plaintiff's



6

claims, he was the Executive Assistant/Satellite Operations Administrator at FCI Estill. Carlton attests that, in this position, in addition to having general overall responsibility for satellite camp activities, he provided direct administrative support to the Warden through continuing assignments and special projects, as well as assistance to institution department heads in achieving specific program management objectives.

Carlton has attached as Exhibit A to his affidavit a copy of his memorandum prepared on August 1, 2013 pertaining to an inmate-on-inmate assault at the satellite prison camp. Carlton attests that on August 1, 2013, he was informed that an inmate-on-inmate physical altercation between Plaintiff and inmate Bryan Best had occurred on July 31, 2013 at approximately 8:15 p.m. Carlton attests that this information had been received by a staff member from another inmate at the satellite camp. Carlton attests that the staff member assigned to the satellite camp that evening had not witnessed the incident, and that no inmate involved or who had witnessed the incident reported it until the next day. Carlton attests that, upon being informed of this incident, he immediately reported to the satellite camp and summoned both the Plaintiff and Best to his office.

Carlton attests that Best arrived first, denied any involvement in an altercation, and was thereafter turned over to the Special Investigative Supervisor (SIS). Carlton attests that when Plaintiff arrived, he initially also denied any involvement in an altercation, but then recanted and told Carlton that he had picked up mail from the camp officer for about twenty-two inmates, which had never been a problem before, and that he had picked up mail for inmate Best many times. Carlton attests that he was further advised Plaintiff that someone else picked up some mail for Best and placed it on his bed, and that because he was expecting some magazines he thought they were his, so he opened them up. Carlton attests that Plaintiff further advised him that once he looked at the

7



outside of the packet, he saw that it was for Best, and that shortly thereafter Best came to his room and asked if he [Plaintiff] had gotten Best's magazines and that Plaintiff told Best yes and gave them to him without incident. Carlton attests that Plaintiff thereafter stated that later when he was coming back into F-Unit, Best struck him in the face with a closed fist and then hit him three more times before inmates broke up the altercation. Plaintiff told Carlton that he had never fought back.

Carlton attests that Plaintiff had visible facial injuries, and that after making his statement he was also turned over to SIS. Carlton attests that he also requested that both inmates have a medical assessment performed upon them. Carlton attests that the SIS had both inmates placed in the Special Housing Unit under administrative detention status pending investigation of the incident, which was wholly consistent with BOP Program Statement 5270.10 (a copy of which is attached to Carlton's affidavit as Exhibit B), and which provides that inmates may be placed in administration detention status while they are under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law. Carlton further attests that, notwithstanding Plaintiff's proclaimed innocence, it is incumbent upon staff to remove individuals suspected of being involved in a physical altercation from the general population, both for their own safety and for the orderly operation of the institution, until all of the facts and evidence about the incident can be ascertained. Carlton attests that, in this specific instance, since no staff member witnessed the incident and neither those involved or those who witnessed the incident reported the incident until the following day, until an investigation was conducted staff did not have sufficient information to determine whether or not the incident was an assault or a fight.

Carlton attests that the investigation by the SIS lead to the conclusion that Best had assaulted Plaintiff, and that the catalyst for the assault was Plaintiff having some of Best's magazines

8



in his possession.  Carlton attests that Best received an incident report, was disciplined, and transferred to another institution, while Plaintiff was permitted to return to the satellite camp on August 21, 2013.

Carlton attests that at FCI Estill all inmate incoming general mail, newspapers, and magazines are processed in the institution mail room, following which mail room staff place the inmate mail in assigned bags and deliver the mail bags to the unit officers.  Carlton attests that this process is set forth in FCI Estill Institution Supplement EST 5800.16 (Mail Management Manual), a copy of which is attached to Carlton's affidavit as Exhibit C.  Carlton attests that while there is no BIP Program Statement, institution supplement or regulation that provides specific instructions on how inmate mail is to be distributed after it is delivered by the mail room staff, the correctional officers' General Post Orders (a copy of which is attached to Carlton's affidavit as Exhibit D) provides that it is the responsibility of the Evening Watch Officer to deliver all correspondence to the proper inmate, that orderlies or inmates should not be permitted to have mail belonging to another inmate, that mail is not be laid on a bed or locker with the assumption that the proper owner will receive it, and that if an inmate happens to be out of quarters during mail call, their mail should be returned to a secure place until the inmate returns to the unit.

Carlton attests that he was not aware of any correctional officer assigned to the satellite camp having instituted a practice of giving mail to an inmate intended for another inmate, that at no time during his tenure as the FCI Estill Satellite Operations Administrator did any inmate inform him that correctional officers assigned to the satellite camp had instituted such a practice, or that any such action by the correctional officers was causing discourse between inmates.  Carlton attests that, had he been personally aware of, or informed of, such a practice taking place, he would



have immediately taken action to stop such practice. Carlton further attests that because he was not informed that correctional officers were not following the guidance set forth in the General Post Orders, and there was no evidence that the alleged inappropriate practice was even utilized on the evening Plaintiff was assaulted, he wrote a memorandum reminding not only staff, but also inmates, that all inmates were to get their own mail and were not to handle or touch any other person's mail, and had it posted.

Carlton also attests that he was not aware of Plaintiff informing any FCI Estill employee prior to the assault on him by Best that he feared any harm from Best, or that Best had threatened him with any harm. Indeed, Plaintiff admitted during his interview on August 1, 2013 that he had picked up mail for Best many times, that there had never been a problem before, and that on the day of the incident when Best confronted Plaintiff about the magazines, Best said everything was fine and there were no problems. Carlton further attests that, contrary to Plaintiff's assertions, Best did not have a history of violence, and prior to his assault on the Plaintiff had not had any previous disciplinary actions for assault, fighting, or any other violent prohibited conduct. Carlton attests that it was also obvious that Plaintiff did not fear any harm from Best, even after the assault, since Plaintiff did not even bother to inform the correctional officers on the evening and morning watch shifts that he had been assaulted. Carlton attests that there was no way he could have foreseen that, because Plaintiff was in possession of Best's mail, Best would assault him.

Finally, Carlton attests that he has no personal knowledge, nor is he aware of any evidence, that any FCI Estill employee "Googled" Plaintiff's name and allowed another inmate to see the results of the search. Carlton attests that because Plaintiff has not, and does not, identify the employee or inmate who allegedly engaged in this conduct, where the act allegedly took place, or

10



has specifically identified any inmate who has harassed or defamed him as a result of any information

purportedly obtained through this conduct, there is no way to ascertain the validity of this allegation.

Carlton also attests that Plaintiff never informed him personally that any other inmate was harassing

or defaming him over information allegedly retrieved from the internet.  See generally, Carlton

Affidavit, with attached Exhibits.

        The Defendant has also submitted an affidavit from Dr. Ivan Negron, a physician

employed by the Federal Bureau of Prisons.  Dr. Negron attests that he is the Southeast Region

Medical Director, and as such serves as the principle advisor to the Regional Director and Deputy

Regional Director in all matters related to health care delivery.  Dr. Negron attests that he is

thoroughly familiar with the medical problems and treatment provided for the Plaintiff, and that the

medical care provided to the Plaintiff for his medical problems has been timely, appropriate, and

evidence based proven effective medical treatment, in accordance with approved policies.  Dr.

Negron has attached a copy of the relevant portions of Plaintiff's BOP medical record to his affidavit

as Exhibit A.

        Dr. Negron attests, as is shown by Plaintiff's medical records, that on August 1, 2013,

Plaintiff was seen by FCI Estill medical staff for a medical assessment after his suspected

involvement in a physical altercation with another inmate.  Dr. Negron attests that, prior to the

examination, Plaintiff stated to medical staff that he had been "sucker punched" and that "nothing

hurt".  A physical examination revealed small superficial abrasions on the upper left cheek, left side

of the nose, and above the right eye; there was a dark blue bruising under the left eye; and a 5.5 cm.

contusion on the back of Plaintiff's head.  Plaintiff denied losing consciousness during or after the



altercation, and did not have a headache. Plaintiff was advised by medical staff to apply ice to the affected areas, and to follow up in sick call if he had any problems or concerns.

Dr. Negron attests that Plaintiff was seen by medical staff for a follow up appointment on August 26, 2013. During this encounter, Plaintiff claimed that he had been feeling dizziness ever since the altercation, and that he felt pain when blowing his nose. An x-ray of Plaintiff's nasal bones was ordered, and medical staff encouraged Plaintiff to avoid fighting and contact sports. Thereafter, a nasal bone x-ray was performed on August 30, 2013, which revealed a non-displaced nasal bone fracture.

Dr. Negron attests that Plaintiff was seen by medical staff for a follow up appointment on September 12, 2013 to discuss the results of his x-ray, at which time medical staff explained to Plaintiff that no medical treatment was necessary for his non-displaced nose fracture and that it would heal on its own. Plaintiff disagreed and threatened to file a lawsuit against the government, so additional x-rays of Plaintiff's nasal bones were ordered. Plaintiff was thereafter seen again by medical staff during a sick call appointment on September 19, 2013, at which time Plaintiff complained that he was still experiencing dizziness/unsteadiness frequently but not necessarily daily, and that this symptom was accompanied by pain in the back of his head. Plaintiff was prescribed Meclizine for dizziness, and a CT scan was ordered to evaluate any intra cranial abnormalities or fracture undetected by x-ray. A CT scan was thereafter performed on September 27, 2013, the results of which revealed no acute intracranial or osseous pathology, with possible chronic non-deformed nasal bone fracture.

Dr. Negron attests that Plaintiff was seen by medical staff for a follow up appointment



on October 3, 2013 to discuss the result of his CT scan, at which time he was advised that the CT scan revealed nothing more than a possible chronic non-deformed nasal bone fracture. Plaintiff stated that that was not possible and that it had to be something else. Medical staff advised Plaintiff to get pain medication from the commissary and use as needed for pain. Dr. Negron attests that an additional x-ray of Plaintiff's nasal bones and skull were taken on October 11, 2013, which revealed an un-displaced nasal bone fracture and normal skull, and that subsequent to these x-rays Plaintiff has not reported to the health services clinic with any further problems or complaints related to dizziness or pain from the nasal fracture.

Dr. Negron attests that the medical care provided to the Plaintiff following his assault was timely, appropriate, and evidence based proven effective medical treatment in accordance with approved policies, and that there is nothing different that could have, or should have, been done in relation to the injuries reported by the Plaintiff and diagnosed by the FCI Estill medical staff. See generally, Negron Affidavit, with attached Exhibit.

The Defendant has also provided an affidavit from James Solvik, who attests that he is the Special Investigative Supervisor (SIS) for FCI Estill, and that in this position he is responsible for conducting investigations of violations of the laws of the United States or infractions of the regulations at the BOP which occur within the confines of the facility. Solvik attests that on August 1, 2013, at approximately 7:15 a.m., information was received by staff that a fight had occurred between Plaintiff and inmate Bryan Best, and that he interviewed both inmates. Solvik attests that Best arrived with no apparent injuries and stated that he did not fight or assault anybody, while Plaintiff arrived and appeared to have injuries consistent with being in an altercation with another



inmate and stated that he had been assaulted by Best the night before. Solvik attests that both inmates were medically assessed, and then placed in the Special Housing Unit in administrative detention status pending further investigation into the incident, as provide by BOP Program Statement 5270.10. Solvik attest that he completed an investigation into the incident, which led him to the conclusion that Best had assaulted the Plaintiff and that the catalysis for the assault was due to some magazines belonging to Best being in Plaintiff's possession. Solvik attests that Best received an incident report, was disciplined, and transferred to another institution, while Plaintiff was permitted to return to the satellite camp on August 21, 2013.

Solvik attests that, prior to Plaintiff's altercation, he had no knowledge that any correctional officer assigned to the satellite camp was giving mail to an inmate intended for another inmate, and that no time prior to Plaintiff's assault did any inmate inform him that correctional officers were following such a practice, or that any such action by the correctional officers was causing discourse between inmates. Solvik further attests that he is not aware of Plaintiff informing any FCI Estill employee prior to the assault that he feared any harm from Best, or that Best had threatened him with any harm, and that contrary to Plaintiff's assertions, Best did not have a history of violence, and that prior to his assault on the Plaintiff did not have any previous disciplinary actions for assault, fighting, or any other violent prohibited conduct. Solvik attests that there is no evidence that any FCI Estill employee could have foreseen that, because Plaintiff was in possession of Best's mail, Best would assault him. Solvik further attests that there is no evidence that Plaintiff feared any further harm from Best even after the assault since Plaintiff did not even bother to inform the correctional officers on the evening and morning watch shifts that he had been assaulted.

14



Finally, Solvik attests that he had no personal knowledge, nor is he aware of any evidence, that any FCI Estill employee "Googled" Plaintiff's name and allowed another inmate to see the result of such search, nor has Plaintiff provided any information to support this claim. See generally, Solvick Affidavit.

The Defendant has also provided an affidavit from Nathan Clark, who attests that he is a Captain and the Department Head of the Correctional Services Department at FCI Estill. Clark attests that in this position, he serves as the resident expert on all custodial and security questions arising at the institution, and has full and final technical responsibility when problems occur during the course of any given shift. Clark attests that the Correctional Services Department is responsible for all of the security measures and anything implemented involving security at FCI Estill, and that he supervises fourteen mid-level supervisors (Lieutenants), who in turn supervise around one hundred thirty correctional officers. Clark attests that on or about August 19, 2013, he reviewed an Inmate Investigative Report prepared by the SIS pertaining to an incident that occurred at the FCI Estill satellite camp on July 31, 2013, between Plaintiff and inmate Bryan Best. This report concluded that Best had assaulted Plaintiff, and that the catalysis for the assault was Plaintiff having some of Best's magazines in his possession.

Clark attests that the BOP designates each inmate to a facility commensurate with their security and program needs through an objective and consistent system of classification, and that there is no evidence whatsoever that prior to his incarceration Best had a history of violence. Clark further attests that, prior to his assault of the Plaintiff, Best did not have any previous disciplinary actions for assault, fighting, or any other violent prohibited conduct, nor is he aware of any other



inmate at the satellite camp expressing concern about Best's presence in the general population, or of any employee or inmate at the satellite camp expressing, prior to the assault, that Best acted or displayed violent behavior.

Clark further attests that all inmate incoming general mail, newspapers, and magazines are processed in the institution mail room, following which mail room staff places the inmate mail in assigned bags and delivers the mailbags to the unit officers, all pursuant to FCI Estill Institutional Supplement EST 5800.16A. Clark attests that FCI Estill correctional officer General Post Orders state that it is the responsibility of the evening watch officer to deliver all correspondence to the proper inmate, that they should not permit orderlies or inmates to have mail belonging to another inmate, that they should not lay mail on the bed or locker of an inmate on the assumption that the proper owner will receive it, and that if an inmate happens to be out of quarters during mail call, then mail should be returned to a secure until the inmate returns to the unit. With respect to Plaintiff's claim that correctional officers had a practice of giving out mail to inmates intended for other recipients, Clark attests that he had no knowledge or information that any such practice was being performed at the satellite camp and that, moreover, the investigation performed on Plaintiff's incident did not reveal any evidence that such a practice was taking place, especially on the evening Plaintiff was assaulted. Clark attests that he has absolutely no knowledge that, prior to Plaintiff's assault, any inmate at the satellite camp ever expressed concern over the manner in which the mail was being distributed, or that any inmate at the satellite camp feared their physical well being was being jeopardized from the way mail was being distributed.

With respect to Plaintiff's placement in the Special Housing Unit, Clark attests that both



Plaintiff and Best were placed in the SHU pending an investigation of the incident pursuant to BOP Program Statement 5270.10, and that with respect to Plaintiff's claim that, after he was placed in the SHU, an inmate who works with staff gathered his personal property and then asked an officer to look up Plaintiff on the internet, that there is no evidence that any employee permitted an inmate to gather Plaintiff's personal property, as staff do not permit inmates to gather other inmates' personal property for packing and storing while in the SHU. Clark attests that it is wholly possible that the staff member who packed and inventoried Plaintiff's property asked other inmates in their living area to confirm which items belonged to the Plaintiff, but that he [Clark] can state with certainty that the staff member did not permit another inmate to gather Plaintiff's personal property.

Further, Clark attests that he is aware of no evidence that any FCI Estill employee "Googled" Plaintiff's name and allowed another inmate to see the results of the search, nor has Plaintiff provided any evidence to support this claim. Clark attests that he is personally unaware of any information that any other inmate has harassed or defamed the Plaintiff based on information allegedly retrieved from the internet, and that if it is Plaintiff's contention that because other inmates have information about him that is on the internet, it must have come from a staff member, Plaintiff's contention is erroneous. Clark attests that and information about Plaintiff's on the internet is available to the public, that inmate families certainly have access to the internet, and therefore any information about the Plaintiff obtained from the internet could have been printed and sent in the mail, or even have been discussed over the telephone. See generally, Clark Affidavit.

The Defendant has also attached a copy of Plaintiff's affidavit of July 6, 2014 (Court Docket No. 18) as an Exhibit to their motion for summary judgment. This attachment includes a



copy of a March 3, 2014 letter to the Plaintiff relating to his tort claim and denying his claim.

  As attachments to his memorandum in opposition to the Defendant's motion, Plaintiff has submitted a printout titled "Scope of Services - Categories of Care"; copies of numerous Requests to Staff Member forms, the earliest of which is dated August 5, 2013, and running through June 23, 2014, wherein Plaintiff complains about his medical care, complains (in August 2013) about getting back "to the camp", requesting copies of his medical records, complains about P. A. Garcia, requests to be seen for follow up by Dr. Reed, and requests a refill of his Meclizine prescription.

  Plaintiff has also attached a copy of a BOP Health Services Clinical Encounter note date June 26, 2014, wherein Plaintiff apparently presented to health services complaining of nausea and vomiting, which Plaintiff attributed to Meclizine use, as well as pain in his nose secondary to the fracture from one year ago.  This exhibit indicates that Plaintiff appeared well, was in no immediate distress, exhibited tenderness upon palpation with gross deformity of nose noted.  Plaintiff was referred for possible medication change and consult for fracture repair.

  Plaintiff has also attached a copy of a letter he wrote on July 27, 2014 to file a "formal complaint" against Dr. Negron because of the affidavit Dr. Negron submitted in this case.  Plaintiff has further attached a copy of a page (it is not clear from what) which discusses the differences between moderate injuries and major injuries, as well as referrals for prosecution by SIS.  Also attached is a copy of a document entitled "Inmate Discipline Program".  Finally, Plaintiff has attached a copy of a "Memorandum for Inmate Population" dated July 25, 2014 dealing with Electronic Emails to Health Services.  See generally, Plaintiff's Exhibits (attached to response in opposition).

  As an attachment to his request to admit additional evidence filed September 10, 2014,



18

Plaintiff has submitted an affidavit wherein he "attests" that Dr. Negron's statements in his affidavit are "false, fabricated and fictitious". Plaintiff specifically complains about Dr. Negron's statement that Plaintiff had not been seen in medical since October 11, 2013, with Plaintiff attesting that he has filed over twenty-seven "cop outs" but has been "refused any care". Plaintiff further attests that he has continually requested health care (as supported by his "cop outs", both paper and electronic) but that the Defendant has refused to respond or place him on call out for medical care. Plaintiff attests that at no time has he ever received any pain medications, and has been refused the ability to be evaluated by a specialist for his vertigo or for his "broken nose and scarred eye". Plaintiff states that the Defendant has a "scope of care" policy providing that severe trauma such as head injuries should receive the highest level of care, but that the Defendant did not follow its own scope of care policy with respect to his injuries. Plaintiff has attached to his affidavit copies of Request to Staff forms from July and August 2014 wherein Plaintiff is asking to be seen by a doctor. Plaintiff has also attached what appears to be an email dated September 3, 2014, apparently to the pharmacy at the prison, where Plaintiff is again requesting to be seen by a physician. See Plaintiff's Affidavit, with attached Exhibits.

Finally, as attachments to his answer to Defendant's reply, also filed September 10, 2014, Plaintiff has resubmitted copies of many of his earlier exhibits, what appear to be some new emails where he continues to complain about his medical care, as well as a page from some publication (unknown) with headlines from two articles, one dealing with a physician being sentenced for sexually abusing prisoners in Georgia and the District of Columbia, and another dealing with the settlement of a tuberculosis lawsuit.



### Discussion

As noted, the Defendant has moved for summary judgment on all of Plaintiff's claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990).

### Federal Tort Claims Act

Plaintiff has asserted his claims under the Federal Tort Claims Act (FTCA). The FTCA waives sovereign immunity and allows suits against the United States for personal injuries caused by government employees acting within the scope of their employment. Under this Act, a plaintiff may recover a monetary award from the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope...of

20



employment."  28 U.S.C. § 1346(b).

Whether any government employee was negligent is to be determined "in accordance with the law of the place where the act or omission occurred," here the State of South Carolina.  28 U.S.C. § 1346(b)(1).  In order to prove negligence in South Carolina, Plaintiff must prove by a preponderance of the evidence that 1) the Defendant had a legal duty of care[3]; 2) the Defendant failed to discharge that duty; and 3) the Defendant's breach proximately caused him injury.  Ajaj v. United States, 479 F.Supp.2d 501, 549 (D.S.C. 2007); Saab v. S.C. State Univ., 567 S.E.2d 231, 237 (S.C. 2002); Fisher v. Shipyard Village Council of Co-Owners, Inc., 760 S.E.2d 121, 129 (S.C.Ct.App. 2014); Hubbard v. Taylor, 529 S.E.2d 549 (S.C.Ct.App. 2000).  A Plaintiff is required to show negligence with reasonable certainty, not through mere conjecture, and he may not attempt to prove negligence through the doctrine of res ipsa loquitur.  Ajaj, 479 F.Supp.2d at 549; Eickhoff v. Beard-Laney, 20 S.E.2d 153, 155 (S.C. 1942); Crider v. Infinger Transportation Co., 148 S.E.2d 732, 734-735 (S.C. 1966).

## I.

### (Inmate Attack)

With respect to Plaintiff being attacked by inmate Best with resulting injuries, the

---

[3]Defendant does not dispute that it had a legal duty of care for prisoners in its custody pursuant to 18 U.S.C. § 4042, which provides that the standard of duty owed by prison officials is that of "reasonable care".  See Johnson v. U. S. Government, 258 F.Supp. 372, 376 (E.D.Va. 1966)[Under Section 4042, a prison official's duty requires only the exercise of ordinary diligence under the circumstance]; see also In re Agent Orange Product Liability Litigation, 635 F.2d 987, 996 (2d Cir. 1980) [dissenting] (citing Owens v. Haas, 601 F.2d 1242 (2d Cir. 1979), cert. denied, 444 U.S. 980 (1979)); Harley v. United States, No. 08-820, 2009 WL 187588 at * 4 (D.S.C. Jan. 26, 2009).



undersigned does not find that the evidence presented to this Court is sufficient to create a genuine issue of fact as to whether the Defendant failed to discharge its duty of "reasonable care". Plaintiff cannot maintain a negligence claim against the Defendant simply because he was assaulted by a fellow inmate. <u>Ajai</u>, 479 F.Supp.2d at 549 [Claimant cannot prove negligence through doctrine of <u>res ipsa loquitur</u>]; <u>Johnson</u>, 258 F.Supp. at 375-376 E.D.Va. [Inmate not entitled to recover on an FTCA negligence claim solely because he was assaulted by another inmate. Rather, the prisoner must prove that prison officials failed to exercise "ordinary diligence under the circumstances"]. The BOP's duty towards the protection of prisoners is not the guarantee of a "risk free environment", and therefore to avoid summary judgment on his claim Plaintiff must have evidence to show a genuine issue of fact that prison officials knew, or reasonably should have known, of a potential problem between Plaintiff and Best and failed to exercise ordinary diligence under the circumstances. <u>Usher v. United States</u>, No. 10-47, 2010 WL 3721385, * 6 (E.D.Ky. Sept. 15, 2010); <u>Buchanan v. United States</u>, 915 F.2d 969, 971 (5th Cir. 1990) [Noting that § 4042 requires the exercise of only "ordinary diligence to keep prisoners safe and free from harm"]; <u>Horne v. Deason</u>, 331 S.E.2d 342, 344 (S.C. 1985) ["[N]egligence is based upon a breach of a duty owed. A breach of duty exists when it is foreseeable that one's conduct may likely injure the person to whom the duty is owed"].

        Plaintiff has provided no evidence whatsoever to establish even an inference that FCI Estill prison officials knew, or should have known, of a potential problem between Plaintiff and inmate Best. Plaintiff has himself not even alleged that he and Best had any problems. In fact, Plaintiff alleges in his Complaint that when Best came and got his magazines from the Plaintiff, that Best "was fine and said no problems and it was obviously an accident". In other words, Plaintiff does



not even allege that he himself knew of any problems between him and Best, or anticipated or had any inkling that Best would later assault him. Plaintiff's theory of liability is that the Defendant knew that Best had a "background and history of attacker", was "known to be violent with a history of drugs and weapons", and that the assault "was allowed, endorsed and supported by the Defendant by and through the egregious actions of its staff and its designation officers, who have, for reasons of prison overcrowding . . . been allowing violent offenders (2) in our camp facilities to the detriment of non-violent inmates". See Plaintiff's Complaint, ¶ ¶ 14, 21.

However, Plaintiff has provided no evidence to support his general and conclusory claim that Best was a known violent inmate with a history of attacking people. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; see also Papasan v. Allain, 478 U.S. 265, 286 (1986) [Courts need not assume the truth of legal conclusions couched as factual allegations]; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]. Conversely, the Defendant has presented sworn statements from BOP officials that Best did not have a history of violence, and that prior to his assault on the Plaintiff Best did not have any previous disciplinary actions for assault, fighting, or any other violent prohibited conduct. See Carlton Affidavit; Solvik Affidavit; Clark Affidavit. Even assuming for purposes of summary judgment that Best's magazines ended up on Plaintiff's bed because of the so called practice of "send by" mail being utilized (of which there is no evidence other than Plaintiff's own self-serving statement that this was the usual practice), Plaintiff has still provided no evidence to



show how any prison official would have anticipated or foreseen that Best would assault him due to Best's mail mistakenly being placed on Plaintiff's bed, as the evidence (including Plaintiff's own evidence) clearly shows that not even Plaintiff himself had any prior fear of Best, or inclination that Best was going to assault him.

The BOP's duty towards the protection of prisoners is not a guarantee of a "risk free environment", and Plaintiff has provided no evidence sufficient to create an inference that FCI Estill prison officials knew, or should have known, of a potential problem between him and Best prior to the incident at issue, or that prison officials otherwise knew or believed Best to be a violent individual or had a propensity for violence, such that he represented a danger to the Plaintiff. Usher, 2010 WL 3721385, at * 6; Parrott v. United States, 536 F.3d 629, 637 (7th Cir. 2008) [Plaintiff must show that BOP staff knew or reasonably should have known of a potential problem between the two inmates]; Horn, 331 S.E.2d at 345 [Prison official cannot be expected to be "a fortune teller"]. Therefore, this claim is without merit and should be dismissed.

## II.

### (Placement in Administrative Detention Status)

Plaintiff's assertion that the Defendant, through its agents, committed a tort prosecutable as a claim under the FTCA by placing him in administrative detention status pending investigation of the altercation between Plaintiff and Best is patently without merit. There simply is no negligence claim here. The evidence shows that when the assault was reported to prison officials, both inmates were brought in and questioned. According to the evidence, Plaintiff blamed Best for the altercation, while Best said there had been no altercation. No staff member witnessed



the incident, and neither those involved or those who did witness the incident reported the incident until the next day. Pursuant to the applicable BOP program statement, inmates may be placed in administrative detention status if their presence in the general population poses a threat to the security or orderly running of the institution, and the inmates are under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law, or a determination has been made that administrative detention status is necessary for an inmate's protection. <u>See</u> <u>Carlton Affidavit</u>, attached Exhibit B.

There is no indication or inference of any negligence on the part of any prison employee in this evidence. <u>Morgan</u>, 829 F.2d at 12 ["Even though <u>pro se</u> litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]. There is no dispute in the evidence that an altercation between Plaintiff and Best occurred, that conflicting statements were provided concerning what had occurred, that an investigation was conducted by the SIS to determine what had in fact occurred, that pursuant to the applicable BOP program statement both inmates were placed in the SHU under administrative detention status pending the outcome of the investigation, and that at the conclusion of the investigation the SIS determined that Best had assaulted the Plaintiff, following which Best was disciplined and transferred to another institution, while Plaintiff was permitted to return to the satellite camp to continue with his programming needs.

Plaintiff has failed to establish, or even create a possible inference, that any prison official failed to exercise "reasonable care" as provided by § 4042 by placing him in administrative detention status during the investigation of the altercation at issue. <u>Johnson</u>, 258 F.Supp. at 372 [duty



of care only requires exercise of ordinary diligence under the circumstances].  The Defendant United States is therefore entitled to summary judgment on this claim.  <u>Eickhof</u>, 205 S.E.2d at 156 [a plaintiff is required to show negligence with reasonable certainty, and not through mere conjecture]; <u>see</u> <u>Papasan</u>, 478 U.S. at 286 [courts need not assume the truth of legal conclusions couched as factual allegations].

**III.**

**(Medical Claim)**

Plaintiff alleges that following the attack on him by Best, the Defendant failed to provide him with proper medical care.  Plaintiff states in his affidavit that, following the altercation with Best, he was only "seen for a few minutes by Nurse Crosby" who conducted only a cursory examination, and was then taken to the SHU without even having been given the ice that Nurse Crosby recommended he receive.  Plaintiff then states in his affidavit that over the next several weeks, even though he was filing "cop-outs" requesting medical attention, that he was denied ice, pain medication, ointments and x-rays to establish the extent of his injuries and was never at any time checked for a concussion, fractures or other serious injuries.  Plaintiff complains that it was not until thirty-one days after the altercation (on August 30, 2013) that he was finally given an x-ray, which showed that he had a non-displaced nasal bone fracture.  Even then, Plaintiff complains that P.A. Garcia told him that his nose would heal on its own and he could get it fixed when he left prison, and simply advised Plaintiff to get pain medication from the commissary and use as needed.  Plaintiff states that he was not ultimately seen by Dr. Reed until September 19, 2013, that he was never taken to a neurologist or specialist, and that he has never been given any medical attention for his broken

26



nose or his damaged eyes.  See generally, Plaintiff's Affidavit (Court Document No. 18).

　　　　　While Plaintiff's statements in his Affidavit and Complaint certainly establish that Plaintiff was not satisfied with the medical care and treatment he received, that is all they establish, that Plaintiff does not personally believe he received proper medical care and treatment for the injuries he suffered in the altercation on July 31, 2013.  However, Plaintiff's own lay opinion that the medical care and treatment he received was improper and constituted malpractice is not itself competent *evidence* to support such a claim.  Luckett v. United States, No. 08-13775, 2009 WL 1856417 at * 5 (E.D.Mich. June 29, 2009) (citing Lambert v. United States, 198 Fed.Appx. 835, 839 (11th Cir. 2006)[affirming dismissal of medical malpractice claim under FTCA where Plaintiff submitted only "his own conclusory allegations."]); cf. Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]).  Rather, to establish a medical malpractice claim in South Carolina, Plaintiff must produce *evidence* sufficient (for purposes of summary judgment) to create a genuine issue of fact that a physician or medical personnel negligently deviated from recognized and generally accepted standards, practices, and procedures in the community which would be exercised by competent physicians in the same specialty under similar circumstances, and that such negligent deviation proximately caused an injury to the Plaintiff.  Dumont v. United States, 80 F.Supp.2d 576, 581 (D.S.C. 2000); Liebsack v. United States, 731 F.3d 850, 854-856 (9th Cir. 2013) [Applying state statute requiring specialized expert testimony in medical malpractice cases to a FTCA action]; Suggs v. United States, 199 Fed.Appx. 804, 807-808 (11th Cir. 2006) [Applying state law for medical

27



malpractice claim in the analysis of a FTCA claim and finding "[a] plaintiff may not rely on his own statements and lay opinions to avoid summary judgment."].

In meeting this standard, Plaintiff bears the burden of establishing by expert testimony both the "standard of care and the Defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the Defendant's conduct". Martasin v. Hilton Head Health Systems, 613 S.E.2d 795, 799 (S.C.Ct.App. 2005), citing Gooding v. St. Francis Xavier Hospital, 487 S.E.2d 596, 599 (S.C. 1997). Plaintiff must also prove that the Defendant's negligence was a proximate cause of an injury he suffered. Carver v. Medical Society of S.C., 334 S.E.2d 125, 127 (S.C.Ct.App. 1985); Martasin, 613 S.E.2d at 799.

Plaintiff has failed to meet this standard, as he has provided no evidence to support his own general and conclusory assertions in his Complaint and affidavits that the care prison officials provided to him was not "reasonable care" under these standards.  Looking at Plaintiff's exhibits, his Request to Staff Member forms simply set out Plaintiff's own lay complaints about the quality of his care, but do not in and of themselves establish that any medical malpractice is being committed, while the one medical document Plaintiff has submitted (the BOP Health Services clinical encounter of June 26, 2014), in addition to being well past the time frame set forth in his Complaint, again fails to constitute probative evidence that any medical malpractice is being committed by any medical provider.  Rather, this document simply details Plaintiff's complaints and condition on examination on that date, notes that he was found to be "well" and "alert and oriented X 3", and that he was to be referred for a possible medication change and consult for a fracture repair.



Conversely, Plaintiff's FTCA claim documents (attached to Lathrop's Affidavit), reflect the following findings with respect to Plaintiff's medical claims:

> As you appeared to have injuries consistent with being in an altercation, you were seen in the Health Services Department. Medical staff reported you had small superficial abrasions on your upper left cheek, the left side of your nose , and above your right eye. There was also a 5.5cm contusion on the back of your head. Upon evaluation, you reported that "nothing hurt," and you had no headache. You were instructed to put ice on the contusion, and follow-up at Sick Call as needed.
>
> On August 26, 2013, you were seen for a follow-up visit, and reported you were having some dizziness and pain when blowing your nose. You denied any bleeding, or difficulty in breathing. A nasal x-ray was performed, which showed on August 30, 2013, a non-displaced nasal bone fracture. On September 12, 2013, during a follow-up exam, you stated you had had something on the back of your head since the altercation, and were going to file a lawsuit against the government. The follow-up x-rays of your nose and skull revealed no abnormalities, with the exception of the non-displaced nasal bone fracture. In addition, a CT scan was ordered and performed in September 2013, which was also negative, except for the same fracture. On October 11, 2013, another nasal bone, and skull x-ray was performed, revealing the same results, negative with the exception of the non-displaced nasal bone fracture. Records revealed that you did not return to the medical department with any complaints from October 13, 2013 through January 17, 2014. You received timely and proper medical care appropriate to your condition. A review of your psychological records also revealed you did not request any services from the Psychology Department regarding the allegations in this claim.

See Defendant's Exhibit (Court Docket No. 19-1, pp. 15-16).

Additionally, the Defendants have submitted an affidavit from a licensed physician who attests that Plaintiff was provided with timely, appropriate, and evidence based proven effective medical treatment in accordance with approved policies, including a physical examination immediately after the incident was reported to authorities on August 1, 2013 which revealed only small superficial abrasions on Plaintiff's upper left check, left side of his nose, and above the right eye, as well as a 5.5cm. contusion on the back of his head; that Plaintiff denied losing consciousness



during or after the altercation and did not have a headache; and was advised by medical staff to apply ice to the affected areas and to follow up in sick call if he had any problems or concerns. Plaintiff was thereafter seen by medical staff for a follow up appointment on August 26, 2013, with an x-ray of Plaintiff's nasal bones being ordered due to Plaintiff's report that he felt pain after blowing his nose; that an x-ray was thereafter performed on August 30, 2013 which revealed a non-displaced nasal bone fracture; that Plaintiff was seen by medical staff for a follow up on September 12, 2013 whereupon medical staff advised Plaintiff that no medical treatment was necessary for his non-displaced nose fracture and that it would heal on its own, but that additional x-rays were nevertheless ordered after Plaintiff disagreed with this advice, that Plaintiff was seen again by medical staff for a sick call appointment on September 19, 2013 with a CT scan being ordered due to Plaintiff's reports of pain in the back of his head (Plaintiff was also prescribed Meclizine at that time); that a CT scan was performed on September 27, 2013 which revealed no acute intracranial or osseous pathology with a possible chronic non-deformed nasal bone fracture; that Plaintiff was thereafter seen for follow up by medical staff on October 3, 2013 to discuss the results of the CT scan; that when Plaintiff was informed that the scan had revealed nothing more than a possible chronic non-deformed nasal bone feature Plaintiff stated that that was not possible and it had to be something else; and that additional x-rays were taken on October 11, 2013 which again showed the non-displaced nasal bone fracture and a normal skull. See generally, Negron Affidavit.

In addition to this affidavit from a licensed physician, the Defendants have also provided copies of Plaintiff's actual medical records showing the results of his examination on August 1, 2013 and detailing the follow up care Plaintiff received, all as attested to by Dr. Negron



in his affidavit. Notably, the medical records for August 26, 2013 state that the contusions on Plaintiff's face, scalp, and neck (except for his eyes) had resolved, while with respect to his eyes Plaintiff's conjunctiva and sclera were normal appearing. Further, Plaintiff's nose displayed no gross deformities at that time. The medical records further reflect that on September 12, 2013, Plaintiff was assessed with a nose fracture, closed and resolved, while on September 19, 2013 Plaintiff generally "appear[ed] well with a generally normal motor exam". Plaintiff had tenderness on palpation over the midline occiput of the skull approximately 4cm. superior to C-1, and vertigo (unspecified). The medical records from that date reflect that his contusions were all resolved while his nose fracture was noted to be closed and resolved. Additionally, Plaintiff was provided medication for his complaints of vertigo. The CT scan of Plaintiff's head on September 27, 2013 states: "no acute intracranial or osseous pathology. Possible chronic non-deformed nasal bone fractures."

The medical records provided as exhibits to this Court, together with the sworn testimony of Dr. Negron, set forth a record of continuous and ongoing care Plaintiff was provided during the relevant time period. In contrast to this medical evidence, other than his own conclusory and self serving speculation, Plaintiff has presented no *medical* evidence whatsoever to show that the medical care he received during the relevant time period was in any way improper. Plaintiff complains that he was never provided with any ice on August 1, 2013, but that failure (assumed to be true for purposes of summary judgment) is not sufficient to create an issue of fact on a claim of medical malpractice. Plaintiff also complains that the Defendant did not follow its own scope of care policy because he was not provided with the recommended treatment for "severe" head trauma.



However, that self-diagnosis is again Plaintiff's own lay opinion, while the actual medical record reflects that Plaintiff was seen and evaluated by medical professionals who provided the treatment they believed to be appropriate, and which Dr. Negron attests was within the appropriate standard of care. Plaintiff has presented no evidence, such as affidavits from other medical professionals or any other type of medical evidence, to show negligence or medical malpractice with respect to this level of care or to otherwise support his claim. Luckett, 2009 WL 1856417 at * 5 (citing Lambert, 198 Fed.Appx. at 839 [affirming dismissal of medical malpractice claim under FTCA where Plaintiff submitted only "his own conclusory allegations."]; Dumont, 80 F.Supp.2d at 581 [In order to establish a medical malpractice claim, the Plaintiff has the burden of proving by a preponderance of the evidence that the physician or medical personnel negligently deviated from the recognized and generally accepted standards, practices, and procedures in the community which would be exercised by competent physicians in the same specialty under similar circumstances, resulting in injuries to the Plaintiff].[4]

---

[4]Additionally, Defendant correctly notes in its brief that, under South Carolina law, to even pursue a malpractice claim in South Carolina a plaintiff is first required to file "as part of the complaint an affidavit of an expert witness which must specify at least one negligent act or omission claimed to exist and the factual basis for each claim . . . .". See S.C. Code Ann. § 15-36-100. Failure to file such an affidavit with the complaint requires dismissal of the case in state court. See Rotureau v. Chaplin, No. 09-1388, 2009 WL 5195968, at * 6 (D.S.C. Dec. 21, 2009). Since Plaintiff's claim has been filed in federal court under the FTCA, and not in state court, Plaintiff may contend that the filing of such an affidavit is not a mandatory prerequisite to the filing of this lawsuit. But see Chappie v. United States, No. 13-1790, 2014 WL 3615384 at * * 1, 5 (D.S.C. July 21, 2014); Jelks v. United States, No. 12-3451, 2014 WL 1096301 at * 3 (D.S.C. Mar. 19, 2014); Millmine v. Harris, No. 10-1595, 2011 WL 317643 (D.S.C. Jan. 31, 2011) [Holding that pre-suit notice and expert affidavit requirements in S.C. Code Ann. § 15-36-100 and 15-79-125 are the substantive law in South Carolina]. Nevertheless, as is set forth hereinabove, even if this is not a requirement to file this claim, Plaintiff has presented no evidence, such as the affidavit required by state statute from

(continued...)



In sum, after review of the evidence and arguments submitted to this Court in the light most favorable to the Plaintiff, the undersigned does not find that Plaintiff has presented a sufficient issue of material fact as to whether prison officials failed to exercise "ordinary diligence under the circumstances" with respect to his medical care. Nothing in the medical evidence provided to this Court supports Plaintiff's negligence claim, and his failure to provide any such evidence is fatal to his claim. Martasin, 613 S.E.2d at 799 [Plaintiff bears the burden of establishing by expert testimony the Defendant's failure to conform to the required standard of care]; House, 824 F.Supp. at 485 [plaintiff's conclusory allegations insufficient to maintain claim]. The Defendant United States is therefore entitled to summary judgment on this claim. Eickhof, 205 S.E.2d at 156 [a plaintiff is required to show negligence with reasonable certainty, and not through mere conjecture]; see Papasan, 478 U.S. at 286 [courts need not assume the truth of legal conclusions couched as factual allegations]; Morgan, 829 F.2d at 12 ["even though pro se litigants are held to less stringent pleading standards then attorneys, the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"].

## IV.

### (Defamation/Privacy Claim)

Plaintiff's final claim is that he has been defamed and/or his right of privacy has been violated because an unnamed correctional officer allowed an unnamed inmate to review unspecified and unidentified internet material about the Plaintiff. Plaintiff has failed to present any evidence to

---

[4](...continued)
an expert or medical professional, or any other type of medical evidence, to support his claim that the care and treatment he received fell below the recognized standard of care.



support such a claim. He has not identified when or where such an event took place, who was involved, or what allegedly private information was obtained and/or what defamatory statements or information have been made or shared about him. As such, this claim can not even survive the less stringent standards for a Rule 12 motion to dismiss, much less a Rule 56 motion for summary judgment. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) [Complaint must set forth sufficient factual matters to state a plausible claim for relief "on its face"]; Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)[Factual allegations must be enough to raise a right to relief above the speculative level]; Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002)[Plaintiff has burden of alleging facts sufficient to state all the elements of a claim]; Fleming v. Rose, 567 S.E.2d 857, 860 (S.C. 2002) [In order to proved defamation, the complaining party must show that an actionable false and defamatory statement was made and published to an unprivileged third party due to the fault of the publisher]; Snakenberg v. Hartford Casualty Ins. Co., Inc., 383 S.E.2d 2, 5 (S.C.Ct.App. 1989) [In order to state a cause of action for invasion of privacy in South Carolina, claimant must show a wrongful appropriation of personality, wrongful publicizing of private affairs, or wrongful intrusion into private affairs]; see also Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 494-495 (1975) [Law of invasion of privacy generally recognizes that the interests of privacy fade when the information involved already appears on the public record]; Barry v. United States Dept. of Justice, 63 F.Supp.2d 25, 28 (D.D.C. Cir. 1999) [Finding that plaintiff had no protectable privacy interest in a report posted on the internet].

Plaintiff has not sufficiently pled, much less provided evidence sufficient to create a genuine issue of fact, that any prison official committed an intentional act violating his privacy or

34



defamation.  <u>Ajaj</u>, 479 F.Supp.2d at 549 [In order to prove negligence in South Carolina, plaintiff must prove by preponderance of the evidence that the defendant failed to discharge a legal duty of care, resulting in an injury to the plaintiff].  This claim should be dismissed.

### **Conclusion**

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted**, and that this case be dismissed.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

September 23, 2014
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

36

